# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| A.J.I.G. GARCIA,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>COMMISSIONER OF SOCIAL<br>SECURITY,<br><br>　　　　　Defendant. | Case No.  1:11-cv-01758-SAB<br><br>**ORDER DENYING PLAINTIFF'S SOCIAL<br>SECURITY APPEAL** |

Plaintiff A.J.I.G. Garcia ("Plaintiff") filed this action seeking judicial review of the final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying Plaintiff's application for benefits under the Social Security Act.  (ECF No. 1.)  All parties have consented to the jurisdiction of a United States Magistrate Judge for all purposes. (ECF Nos. 12, 14.)

Plaintiff suffers from attention deficit-hyperactivity disorder (ADHD), oppositional defiant disorder (ODD), disruptive behavioral disorder, learning disorder and asthma.  (AR 21.) For the reasons set forth below, Plaintiff's appeal from the administrative decision of the Commissioner is denied.

1

# I.

## FACTUAL AND PROCEDURAL BACKGROUND

On April 30, 2008, an application for Supplemental Security Income ("SSI") benefits was filed on behalf of Plaintiff, who is a child under the age of 18.  (AR 18.)  Plaintiff alleged a disability onset date of February 18, 2008.  (AR 18.)  Plaintiff's claim was denied initially on October 2, 2008 and denied upon reconsideration on March 12, 2009.  (AR 18.)  Plaintiff requested a hearing on April 28, 2009.  (AR 18.)  Two hearings took place before Administrative Law Judge Sharon L. Madsen ("the ALJ") on December 16, 2010 and October 21, 2010.  (AR 18, 28.)  Plaintiff was represented by attorney Geoffrey Hayden at the hearing before the ALJ on December 16.  (AR 18.)

On December 23, 2010, the ALJ found that Plaintiff was not disabled and denied his application for benefits.  (AR 18-28.)  The Appeals Counsel denied Plaintiff's request for review on July 21, 2011.  (AR 6.)

### A.    The ALJ Hearing Testimony

Plaintiff's mother, Laticia Garcia, was present at the hearing on October 21, 2010.  (AR 67-75.)  Plaintiff did not appear because Ms. Garcia was not aware that Plaintiff had to be present.  (AR 69.)  Plaintiff/Ms. Garcia was not represented at the hearing on October 21, but the ALJ informed Ms. Garcia about the availability of counsel.  (AR 71.)   The hearing was rescheduled to allow Plaintiff to appear and to allow Plaintiff to look for counsel.  (AR 73.)

Plaintiff, Laticia Garcia (Plaintiff's mother) and Margie Salinas (Plaintiff's aunt) testified at the hearing before the ALJ on December 16, 2010.  (AR 34-66.)  Plaintiff's attorney, Geoffrey Hayden was present and participated at the hearing.  (AR 34-66.)

#### 1.    Plaintiff's Testimony

Plaintiff was born on November 7, 2001, making him nine years old at the time of the hearing.  (AR 38.)  Plaintiff was in fourth grade at the time of the hearing.  (AR 39.)  Plaintiff testified that his grades are "good" and that he had recently been doing better at school.  (AR 39.)  Plaintiff also said that he was getting along with the other kids in class.  (AR 39.)  When asked if he had any "best friends" Plaintiff said "kind of" and that "[s]ometimes like I'll just hang out with

2

1   one of my friends, sometimes a lot." (AR 39.)  Plaintiff says he plays "kickfence" with his friend.

2   (AR 39-40.)  When asked what else he does with his friend, Plaintiff said "[w]ell we usually like

3   talk." (AR 40.)

4          Plaintiff has four sisters and one brother.  (AR 40.)  Plaintiff does not live with his

5   siblings.  (AR 41.)  Plaintiff lives with his aunt, his eight-year-old cousin Carlos and two older

6   cousins Alexis and Anthony.  (AR 41.) Plaintiff said he fights a lot with his cousin Anthony, who

7   is 19-years-old.  (AR 41.)

8          Plaintiff plays on the computer and plays PlayStation with his cousin Carlos.  (AR 41.)

9   When asked if he can keep track of what is going on in a video game or a television show,

10  Plaintiff said "no."  (AR 41-42.)  When asked how long he can play without getting bored,

11  Plaintiff said "[m]aybe like, a long time?"  (AR 42.)  Plaintiff said he does not know if he can sit

12  through a whole TV program.  (AR 42.)  Plaintiff said he does not have any chores that he is

13  supposed to do at home, but does sometime clean up his toys.  (AR 42.)

14         The ALJ asked Plaintiff about his temper tantrums at school and asked if Plaintiff still gets

15  mad and throws things.  (AR 42.)  Plaintiff said he does "[a]t [his] aunt's house."  (AR 42.)

16  Plaintiff said he does not know how often it happens.  (AR 42.)  Plaintiff said he is taking his

17  medication and that it "[k]ind of" helps calm him down.  (AR 43.)

18         Plaintiff said that he is getting along with his teacher and that he likes him because "[h]e's

19  nice."  (AR 43.)  At school, Plaintiff said that he likes to draw and that "[d]ividing" is hard for

20  him. (AR 44.)  Plaintiff remembered being suspended from school a few times.  (AR 48.)

21         2.    Ms. Garcia's (Plaintiff's Mother) Testimony

22         Ms. Garcia reported that Plaintiff's anger is his most significant behavioral issue.  (AR

23  44.)  Ms. Garcia stated that her son does not play long with his cousins and prefers to be by

24  himself.  (AR 44.)  Ms. Garcia admitted that she does not see Plaintiff "that much," and only sees

25  Plaintiff on Saturdays and Sundays.  (AR 45.)

26         Ms. Garcia stated that Plaintiff has problems following directions.  (AR 45.)  For example,

27  Ms. Garcia had trouble bringing Plaintiff to the hearing.  (AR 45.)  Ms. Garcia also stated that

28  Plaintiff had problems sitting still.  (AR 45.)  However, at that point in the hearing, the ALJ noted

3

1   that Plaintiff was "doing just fine there," which Ms. Garcia acknowledged.  (AR 45.)

2        Ms. Garcia stated that there's "a whole difference" when Plaintiff is on his medication and

3   when he is not.  (AR 46.)  Ms. Garcia stated her other kids notice the difference.  (AR 46.)  Ms.

4   Garcia noted the difference because at one point, she decided to not give Plaintiff his medications

5   on weekends or during the summer when he was not at school.  (AR 46.)  However, "it didn't

6   work out" and Ms. Garcia "had to give it to him."  (AR 46.)

7        Plaintiff sees a doctor once a month and receives therapy twice a month.   (AR 46.)

8   However, Ms. Garcia stated that Plaintiff was still having the same problems he had a year or two

9   ago.  (AR 48.)  Plaintiff gets angry, throws things, slams doors and yells.  (AR 49.)  Ms. Garcia

10  reported that this behavior does not occur when Plaintiff is on his medication and at school.  (AR

11  49.)  Ms. Garcia stated that when Plaintiff gets home, the medication wears off and Plaintiff

12  "starts getting into his moods."  (AR 49.)  At this point, Mr. Hayden asked about Plaintiff's prior

13  suspensions and why the medication did not prevent those incidents and Ms. Garcia initially

14  stated that there was a while when Plaintiff was not on his medications at school, which resulted

15  in Plaintiff's suspensions.  (AR 49.)  Ms. Garcia later said, "you know what?  Yeah, on his

16  medication he does act up."  (AR 49-50.)

17       Ms. Garcia stated that approximately two months prior, Plaintiff's medication was

18  increased.  (AR 50.)  At the time of the hearing, Plaintiff was taking Trazodone and Vyvanse.

19  (AR 50.)  The Vyvanse is for Plaintiff's ADHD.  (AR 50.)

20       Plaintiff is not involved in any group or team activities.  (AR 51.)  Plaintiff has friends his

21  age at school.  (AR 51.)  Plaintiff gets along with his brothers and sisters some times, but not all

22  the time.  (AR 51.)  Plaintiff does not participate in social activities such as games or parties.

23  (AR 51.)

24       Ms. Garcia said that Plaintiff does not finish things he starts because he gets frustrated.

25  (AR 52.)  Plaintiff does recognize and avoid danger, such as when crossing a street.  (AR 52.)

26  Plaintiff takes care of his own things, but sometimes throws his toys against the wall when he gets

27  mad.  (AR 53.)  Plaintiff used to put holes in the wall but Ms. Garcia said that he is no longer

28  doing that.  (AR 53.)  Recently, Plaintiff got in trouble for pushing a little boy in front of a bus.

(AR 53.)

3.      Ms. Salinas' (Plaintiff's Aunt) Testimony

Ms. Salinas reported that Plaintiff had been living with her since May (approximately seven months at the time of the hearing).  (AR 56.)  Ms. Salinas said that Plaintiff was "doing good," but "has a lot of issues."  (AR 57.)  Ms. Salinas cited Plaintiff's anger problems, forgetfulness and the fact that Plaintiff is not sociable.  (AR 57.)  "[P]eople irritate [Plaintiff], he'll play with [Ms. Salinas'] grandson and granddaughter, just for a little while and they aggravate him and he has to get away from them."  (AR 57.)

Plaintiff has not been suspended from school in the past year, but he has been sent home.  (AR 57.)  Plaintiff was sent home because he was causing a distraction in the classroom.  (AR 58.)  There was one incident where Plaintiff left the classroom and did not want to listen to anybody, so Ms. Salinas had to pick him up.  (AR 58.)

Ms. Salinas confirmed that Plaintiff sees a doctor and sees a therapist every two weeks.  (AR 58.)  Ms. Salinas started taking Plaintiff to another doctor because she felt that the former doctor was not "really working with him, like she should."  (AR 58.)

Ms. Salinas reported that Plaintiff has been more aggressive lately, even when he is on his medications.  (AR 59-60.)  The other day, Plaintiff came home from school and started having a tantrum by banging his head against the wall.  (AR 60.)  Ms. Salinas tried to talk to Plaintiff, but Plaintiff refused to talk to her.  (AR 61.)  Ms. Salinas stated that Plaintiff used to bang his head on the counter or other objects, but that behavior had stopped for a while until the recent incident.  (AR 61.)  Ms. Salinas stated that Plaintiff does not do any housework or pick up after himself.  (AR 61.)

**B.      Plaintiff's Medical/Educational Records**

1.      January 4, 2008 Kern County Mental Health System of Care Assessment

On January 4, 2008, Plaintiff received a mental health assessment from Shahzad Chaudhry from the Kern County Mental Health System of Care.  (AR 336-343.)  Plaintiff was referred after exhibiting "multiple problems" at his school.  (AR 336.)  Plaintiff did not listen to school staff, went under a table when asked to do something, was easily aggravated and threw

1    items at staff and others.  (AR 336.)  Plaintiff also fought with siblings at home and at school.

2    (AR 336.)

3        Chaudhry noted that Plaintiff's behavior had been present since Plaintiff was in

4    kindergarten, but stabilized for a time when Plaintiff began living with his aunt.  (AR 336.)

5    Plaintiff came into the assessment having a significant tantrum.  (AR 337.)  Chaudhry noted that

6    Plaintiff hid under a table and chairs and tried knocking them over.  (AR 337.)  Chaudhry also

7    noted that Plaintiff hit his head on the cabinets and walls in the office when he wanted various

8    items in the office but was not allowed access to them.  (AR 337.)

9        Plaintiff's mother informed Chaudhry that she had a drug usage problem (cocaine, heroin

10   and PCP).  (AR 337.)  Plaintiff was born with drugs in his system.  (AR 337.)

11       At the time of the assessment, Plaintiff was not in any special education courses, but had

12   difficulty in reading and writing.  (AR 339.)  Plaintiff had "significant conduct difficulties at

13   school resulting in detentions but then the mother pulled him out of school."  (AR 339.)

14       Plaintiff reported having one friend who he plays with at Tabitha's house (where

15   Plaintiff's mother was receiving drug addiction treatment).  (AR 339.)  Plaintiff also told

16   Chaudhry that his interactions with children at school result in fights and that he does not interact

17   with his 11-year-old sister.  (AR 339.)  Plaintiff's mother stated that Plaintiff helps clean around

18   the house, helps with groceries and has no specific problems assisting others with chores, but

19   Chaudhry noted that this information contradicted all other reported information and observations

20   during the session.  (AR 339.)

21       Chaudhry rated Plaintiff in four "Current Life Functioning Areas."  (AR 341.)  Plaintiff

22   was given a rating of "3" on a scale ranging from 0 to 4 in the areas of "Independent Living,"

23   "Social Relationships," and "Vocation/Education."[1]  (AR 341.)  Chaudhry provided the following

24   summary:

25           ...it is clear that [Plaintiff's] functioning is impaired and will not
             improve without significant intervention.   Diagnoses of ODD,
26           Victim of childhood neglect, and Parent-child relational problem

27   _____

[1] The report provides the following interpretation of the 0-4 scale: "Rating is: 0 = None; 1 = Mild; 2 = Moderate; 3 =
28   Severe; 4 = Extreme."  (AR 341.)  However, the report provides no other explanation for the rating system.

were offered.  Poor attachment with the parent figures along with neglect, possible abuse, and mixture between authoritarian and permissive parenting styles has led to individual's problematic behavior, which is worsening, as he gets older.  Individual appears to be able to control his behavior somewhat, especially when his demands are met.  This suggests that individual's problematic behaviors may simply be learned and need to be extinguished via behavioral therapy....  Individual would benefit from a psychiatric evaluation, as medication may be required to reduce individual's angry and otherwise problematic behaviors....

(AR 343.)

     2.    <u>February 4, 2008 Visit With Dr. Molla</u>

On February 4, 2008, Plaintiff was seen by treating psychiatrist Dr. Mohammed Molla, M.D. (AR 297-302.)   Plaintiff, Ms. Garcia and Plaintiff's "maternal aunt" (presumably Ms. Salinas) were present at the visit.  (AR 297.)  Dr. Molla was informed of Plaintiff's anger issues at home and at school.  (AR 297-298.)  Dr. Molla noted that Plaintiff went through a lot of changes in the household, as Plaintiff moved between living with his mom and maternal aunt numerous times.  (AR 298.)  At the time, Plaintiff had not yet been on any psychiatric medication.  (AR 298.)  Dr. Molla noted that Plaintiff was born premature and "was exposed to crack cocaine, PCP and methadone throughout his whole intrauterine life."  (AR 298.)  Plaintiff had a family history of depression (mother and maternal cousin), polysubstance abuse (mother), bipolar disorder (maternal cousin) and suicide (nephew).  (AR 299.)  When Plaintiff was between the age of 1.5 and 4 years of age, he was taken care of by his mother and "was exposed to neglect as mother was using drugs and alcohol."  (AR 299.)

During the visit, Plaintiff did not make eye contact or look at Dr. Molla.  (AR 299.)  Before the visit, Plaintiff was playing with toys in the lobby and resisted coming into the office.  (AR 299.)  Plaintiff did not want to shake hands with Dr. Molla.  (AR 299.)

Dr. Molla concluded that Plaintiff's behavioral problems may be linked with his intrauterine drug exposure.  (AR 300.)  Dr. Molla also noted that Plaintiff exhibited trust issues that may be linked to Plaintiff's history of moving between primary caregivers.  (AR 300.)  Dr. Molla did not recommend medication at the time.  (AR 301.)  Dr. Molla recommended an IEP to rule out a learning disorder and help Plaintiff with appropriate classroom treatment.  (AR 301.)

Dr. Molla also recommended parent training, play therapy and possible psychological testing in the future.  (AR 301.)  Dr. Molla recommended that Plaintiff return to clinic within four weeks. (AR 301.)

3.    February 13, 2008 – April 28, 2008 Progress Notes

The record includes several "Group Progress Notes" and "Individual Progress Notes" for Plaintiff signed by Gabriella Brit between February 13, 2008 and April 28, 2008.  (AR 313-335.) During a session on February 13, 2008, the group (including Plaintiff) was asked to discuss anger, and Plaintiff reported that "he is like a crazy pig when he is mad because he doesn't like people and hits people."  (AR 335.)  The same day, Plaintiff's teacher reported a decrease in problematic behavior.  (AR 334.)  The session on February 20, 2008 also involved the topic of "anger," and Plaintiff reported that "he will get mad and not know why" and "he throws chairs when angry." (AR 333.)

The February 25, 2008 session concerned "self-control," and Plaintiff reported that "when gets mad he throws stuff and hides from his mom because he doesn't want to get a spankin'." (AR 332.)

On March 3, 2008, Plaintiff's family reported that Plaintiff continued to have anger outbursts at home when Plaintiff does not get his way or has to share.  (AR 330.)  However, Plaintiff did not receive phone calls from the school.  (AR 330.)  Plaintiff did not show up for his group session that day.  (AR 329.)

On March 13, 2008, Plaintiff's mother reported three incidents where Plaintiff was suspended within the past week.  (AR 326.)  Plaintiff was getting in trouble for distracting the class and failing to follow directives.  (AR 326.)  Plaintiff's teacher reported that Plaintiff "has been having a lot of problems."  (AR 325.)  Plaintiff was getting out of his seat "all the time" and "is constantly distracting others."  (AR 325.)  Plaintiff urinated on a student's leg.  (AR 325.)

On March 18, 2008, Plaintiff participated in a group session on "acting appropriately in a community setting."  (AR 324.)  Plaintiff "was well-behaved and cooperative," was "able to follow most adult directives," "participated in group activity and shared ideas," and "displayed respect for others."  (AR 324.)  However, Plaintiff "[n]eeded a couple of reminders to wait for

8

group." (AR 324.)

On March 26, 2008, Plaintiff reported that he did not like to do school work and wanted to become an "animal doctor" someday. (AR 323.) Plaintiff was also well-behaved and cooperative during the group session, which involved "losing." (AR 322.) Plaintiff "did not become angry/frustrated when he lost." (AR 322.)

On April 7, 2008, Plaintiff reported moving to a new house. (AR 321.) Plaintiff "was well-behaved and cooperative" during the group session, which involved "Saying 'No' without Sounding Rude." (AR 321.) Plaintiff was able to discern when people were being rude versus being polite. (AR 321.)

On April 9, 2008, Plaintiff's aunt reported that Plaintiff "has been doing 'better.'" (AR 318.) Plaintiff's aunt denied any problems with Plaintiff at the time and that she "would like to get guardianship of [Plaintiff] due to [Plaintiff] doing so well when he is in her care." (AR 318.) Plaintiff's aunt and uncle talked about taking Plaintiff off medication because they did not want Plaintiff on medication. (AR 318.)

On April 14, 2008, Plaintiff was "well-behaved and cooperative" during a group session, which involved "Stress Reduction – Family." (AR 317.) Plaintiff spoke about his mother, grandmother, little brother, cousin and dog. (AR 317.) Plaintiff reported that he was closest to his brother. (AR 317.)

On April 21, 2008, Plaintiff was again "well-behaved and cooperative" during a group session about problem solving. (AR 316.) Plaintiff "had some understanding of [the] group activity" and "was able to work cooperatively with peer[s] and problem-solve." (AR 316.)

On April 27, 2008, Plaintiff was "well-behaved and cooperative" during a group session about decision making. (AR 313.) Plaintiff "had minimal understanding of [the] group activity" and "[n]eeded a facilitator['s] assistance to complete [the] task." (AR 313.) Plaintiff "[d]isplayed difficulty in decision-making skills," but displayed a "[h]appy affect," was "[s]miling," and "[i]nteracted well with peers." (AR 313.)

4.     Recent Medical Records

On April 21, 2008, Octavio Fernandez, school psychologist, authored a Psychological

Report for Plaintiff.  (AR 306-311.)  Fernandez noted that during a fifteen minute observation session, Plaintiff was observed as "on-task" for only 32% of that time.  (AR 308-309.)  Plaintiff was "out of seat" 42% of the time and "playing with objects" 25% of the time.  (AR 308-309.)  Comparatively, the rest of the class was "on-task" approximately 83% of the time.  (AR 309.)  Fernandez recommended special education support services in reading and math, and monitoring on a frequent basis.  (AR 311.)

On August 6, 2008, child psychiatrist J. Trachtenberg completed a Childhood Disability Evaluation Form for Plaintiff.  (AR 349-354.)  Trachtenberg concluded that Plaintiff's impairment or combination of impairments is severe, but did not meet or medically equal any of the listings.  (AR 349.)  Trachtenberg indicated that Plaintiff had "less than marked" limitations in the categories of "Acquiring and Using Information," "Attending and Completing Tasks," "Interacting and Relating With Others" and "Caring For Yourself."  (AR 351-352.)  Plaintiff had "no limitation" in "Moving About and Manipulating Objects."  (AR 352.)

On August 6, 2008, Plaintiff received a Psychological Evaluation from J.K. Zhang, Psy.D.  (AR 355-359.)  Zhang noted that Plaintiff recently completed first grade and was placed in special education programs at the end of the last school year.  (AR 356.)  Plaintiff was performing poorly at school academically and suffered from frequent outbursts at school.  (AR 356.)  Plaintiff occasionally gets into physical fights with other students and received at least 20 disciplinary referrals during the last semester.  (AR 356.)

On the Wechsler Intelligence Scale for Children – IV ("WISC-IV"), Plaintiff's perceptual reasoning and processing speed where satisfactory, but Plaintiff was below average in verbal comprehension and working memory.  (AR 357.)  Zhang concluded that this profile suggested a learning disorder.  (AR 357.)

On the Vineland Adaptive Behavior Scales ("VABS"), Plaintiff "performed poorly."  (AR 357.)  Plaintiff demonstrated impaired communication, daily living and socialization skills.  (AR 357.)  Plaintiff's "Age Equivalent" in Communication was 4 years, 8 months, in Daily Living was 5 years, 5 months, and in Socialization was 3 years, 1 month.  (AR 357.)

Plaintiff performed "somewhat poorly" on the Bender-Gestalt II ("BG-II").  (AR 357.)

1    Zhang indicated that Plaintiff's scores suggested borderline neuropsychological deficits.  (AR

2    357.)

3        Zhang diagnosed Plaintiff with Attention Deficit Hyperactivity Disorder (ADHD),

4    Learning Disorder (NOS), Neglect of Child (in the past) and Oppositional Defiant Disorder.  (AR

5    358.)

6        On October 1, 2008, Dr. H. Biala, M.D. authored a Case Analysis and Childhood

7    Disability Evaluation Form.   (AR 360-367.)   The Childhood Disability Evaluation Form

8    concluded that Plaintiff's impairments or combination of impairments are severe, but do not meet

9    or medically equal the listings.  (AR 362.)  Plaintiff was found to have a "less than marked"

10   limitation in the categories of "Acquiring and Using Information," "Attending and Completing

11   Tasks," "Interacting and Relating With Others," and "Caring For Yourself."  (AR 364.)

12       On December 11, 2008, Plaintiff received a reassessment from the Kern County Mental

13   Health System of Care, completed by John Rodriguez.  (AR 372-376.)  Plaintiff was given a

14   "Severe" rating in the areas of "Social Relationships" and "Vocation/Education."  (AR 372-373.)

15   Plaintiff received a "Moderate" rating in the area of "Independent Living."  (AR 372.)  Plaintiff

16   received a "None" rating in the area of "Physical Care."  (AR 373.)

17       On March 5, 2009, Plaintiff received a case analysis from "M. Caporale."  (AR 303-305.)

18   Caporale noted that Plaintiff's mother stated that he was "doing good" in October 2008 and

19   Plaintiff received an "achievement award" after being placed on medication."  (AR 304.)   In

20   January 2009, there was a report of decreased fighting with neighbors, decrease in defiance at

21   school and that Plaintiff was slowly improving.  (AR 304.)  Caporale noted that Plaintiff appeared

22   to be improving and affirmed the prior assessments.  (AR 304.)

23       On March 5, 2009, Plaintiff also received a Childhood Disability Evaluation from R.

24   Tashjian.  (AR 385-389.)  Tashjian indicated that Plaintiff's impairments do not meet or equal

25   any of the listings.  (AR 385.)   Tashjian also indicated that Plaintiff had "less than marked"

26   limitations in the domains of "Acquiring and Using Information," "Attending and Completing

27   Tasks," "Interacting and Relating With Others" and "Caring For Yourself."  (AR 387.)  Tashjian

28   did not identify any other limitations in any other domains.

On August 18, 2010, Plaintiff received an Assessment from the Kern County Mental Health Department authored by Carolyn Michelle Cummings. (AR 398-407.) The assessment noted that Plaintiff was prescribed Vyvanse and Trazodone and that "[h]is anti-social behaviors are contained well by the medication but he continues to experience the above symptoms according to parental report." (AR 398.) The report also states that "[Plaintiff] is currently doing well academically. When he began taking Vyvanse, [Plaintiff] began pulling his grades up and he is now on grade level. He has had fewer and fewer incidents at school and began to get along with peers and fight less often with them." (AR 398.) Cummings also stated that Plaintiff "no longer meets criteria for Conduct Disorder because his behaviors have improved substantially now that he lives with his aunt full time. Plaintiff rarely throws temper tantrums anymore but continues to choose aggressive expressions of anger toward peers." (AR 399.)

Cummings gave Plaintiff a "Moderate" rating in "Social Relationships." (AR 401.) Cummings remarked that Plaintiff "prefers playing by himself and does not make friends easily.... He can be aggressive with peers who try to share with him or want to play with him. He often fights with his siblings and tries to spend more time with his aunt than his biological mother." (AR 401.) Cummings gave Plaintiff a "mild" rating in the category of "Vocational/Educational." (AR 401.)

### C.   The ALJ's Findings

The ALJ made the following findings of fact and conclusions of law:

- Plaintiff has not engaged in substantial gainful activity since April 30, 2008, the application date;

- Plaintiff has the following severe impairments: attention deficit-hyperactivity disorder (ADHD), oppositional defiant disorder, disruptive behavioral disorder, history of learning disorder and asthma;

- Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1;

- Plaintiff does not have an impairment or combination of impairments that functionally

1    equals the listings; and

2    • Plaintiff has not been disabled, as defined in the Social Security Act, since April 30, 2008,

3        the date the application was filed.

4    (AR 21-27.)

5                                      **II.**

6        **LEGAL STANDARDS FOR JUDICIAL REVIEW OF SOCIAL SECURITY**
                                 **DETERMINATIONS**
7
8        An individual may obtain judicial review of any final decision of the Commissioner of

9    Social Security regarding entitlement to benefits.   42 U.S.C. § 405(g).   The Court "reviews the

10   Commissioner's final decision for substantial evidence, and the Commissioner's decision will be

11   disturbed only if it is not supported by substantial evidence or is based on legal error."   Hill v.

12   Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012).   "Substantial evidence" means more than a scintilla,

13   but less than a preponderance.   Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal

14   quotations and citations omitted).   "Substantial evidence is 'such relevant evidence as a

15   reasonable mind might accept as adequate to support a conclusion.'"   Id. (quoting Richardson v.

16   Perales, 402 U.S. 389, 401 (1971)).   "[A] reviewing court must consider the entire record as a

17   whole and may not affirm simply by isolating a specific quantum of supporting evidence."   Hill,

18   698 F.3d at 1159 (quoting Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)).

19   However, it is not this Court's function to second guess the ALJ's conclusions and substitute the

20   Court's judgment for the ALJ's.   See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005)

21   ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's

22   conclusion that must be upheld.")

23                                      **III.**

24                         **DISCUSSION AND ANALYSIS**

25       Plaintiff contends that the ALJ erred because the ALJ concluded that Plaintiff had a "less

26   than marked limitation in interacting and relating with others." (Pl.'s Opening Brief 7:1-13:2, AR

27   25.) Plaintiff contends that the record mandated that the ALJ conclude that Plaintiff suffers from

28   a marked and severe limitation in the domain of interacting and relating with others.  (Pl.'s

                                        13

Opening Brief 12:21-26.)

Plaintiff contends that the ALJ improperly afforded substantial weight to the opinions of the state agency physician.  (Pl.'s Opening Brief 12:16-13:2.)  Here, the ALJ afforded substantial weight to the opinions of R. Tashjian.  (AR 22.)  Plaintiff contends that "[t]he state agency physician's opinion that [Plaintiff's] ability to interact with others as less than marked is contrary to the record as a whole for the reasons previously stated."  (Pl.'s Opening Brief 12:19-21.)  The "reasons previously stated" consist of Plaintiff's summary of Plaintiff's tantrums, disciplinary history and isolative behavior.

This Court's role is limited to determining whether the ALJ's decision is supported by substantial evidence.  See Burch, 400 F.3d at 679.  Plaintiff's recitation of the facts and evidence, at most, show that there was some evidence supporting a contrary conclusion.  However, in order to warrant reversal, Plaintiff must identify some legal error committed by the ALJ, or show that the ALJ's determination was not supported by substantial evidence.  Hill, 698 F.3d at 1158. Plaintiff cannot merely isolate the evidence favorable to his position.

Here, substantial evidence supports the ALJ's determination.  Plaintiff testified at the hearing that his grades were good and he had been doing better at school.  (AR 39.)  Plaintiff also testified that he was getting along with the kids in his class.  (AR 39.)  Plaintiff's mother testified that Plaintiff does well when he is on his medications.  (AR 49.)  Plaintiff's aunt testified that Plaintiff had not been suspended in the past year.  (AR 57.)  The most recent medical and educational records documented Plaintiff's improvement while on medication.

Moreover, Plaintiff fails to demonstrate that the ALJ's reliance on Tashjian's Childhood Disability Evaluation constituted legal error.  Plaintiff contends that Tashjian's opinions were "contrary to the record as a whole," but fails to identify any specific aspect of the opinion that was defective.  Tashjian's opinions are corroborated by the other opinions in the record.  J. Trachtenberg, and Dr. H. Biala, M.D. opined that Plaintiff's limitations in "Interacting and Relating With Others" was "less than marked."  (AR 351, 364.)  Although Drs. Chaudhry and Rodriguez gave Plaintiff a "3" rating in the area of "Social Relationships," which translates to "Severe" (AR 341, 372), those ratings are not necessarily equivalent to the domain ratings under

14

the Social Security Act.[2]  Moreover, most recently, Plaintiff was given a "moderate" rating in the life area of "Social Relationships by Carolyn Michelle Cummings on August 18, 2010.  (AR 401.)  Cummings' ratings are consistent with Plaintiff's demonstrated improvement while on medication.  The record suggests that Plaintiff's condition reached a turning point around March 2009, when "M. Caporale" noted that Plaintiff had been doing well on medication.  (AR 304.)  Drs. Chaudhry and Rodriguez's opinions regarding Plaintiff's "Severe" rating in "Social Relationships" were rendered prior to the March 2009 turning point.

Plaintiff contends that the ALJ incorrectly indicated that Plaintiff has friends at school. (Pl.'s Opening Brief 11:11-12.)  Plaintiff contends that Plaintiff's "persistent tendency for isolation and inability to keep friends indicates that the ALJ was incorrect in that regard."  (Pl.'s Opening Brief 11:12-14.)  Plaintiff's testimony at the hearing identified at least one "best friend." (AR 39.)  It is not clear whether Plaintiff has any other friends.  However, Plaintiff's argument that the record "indicates" that Plaintiff does not have any other friends is not persuasive. Plaintiff was in the best position to supplement the record if the number of friends he had was relevant.  Plaintiff failed to testify as to the number of friends he had.  The Court will not assume that the number would have weighed in Plaintiff's favor when Plaintiff's attorney had the opportunity to ask Plaintiff for the exact number at the hearing.  Moreover, Plaintiff's testimony indicated that he got along reasonably well with his cousin Carlos (AR 41) and Dr. Chaudhry's notes indicated that Plaintiff had a friend at Tabitha's house (AR 339), suggesting that his social skills are not as limited as Plaintiff's brief "indicates."

Plaintiff also argues that, even if he is not currently disabled, he should be awarded benefits for the period of April 30, 2008 through August 2010 because he was disabled during that time.  Plaintiff contends that his condition may have improved in August 2010, but his condition prior to that time would have warranted an award of benefits.   However,

---

[2] The "life areas" considered by Drs. Chaudhry and Rodriguez included "Independent Living," "Social Relationships," "Vocation/Education" and "Physical Care.  (See, e.g., AR 372-373.)  The "domains" considered under the Security Act are "Acquiring and using information," "Attending and completing tasks," "Interacting and relating with others," "Moving about and manipulating objects," "Caring for yourself," and "Health and physical well-being."  20 C.F.R. § 416.926a(b)(1)(i)-(vi).

1    "[i]mpairments that can be controlled effectively with medication are not disabling for the

2    purpose of determining eligibility for SSI benefits."   Warre v. Commissioner of Social Sec.

3    Admin., 439 F.3d 1001, 1006 (9th Cir. 2006).

4            Here, Plaintiff's condition improved while under medication, showing that his impairment

5    can be controlled effectively with medication.  Plaintiff's behavioral outbursts prior to being

6    prescribed medication would not support a finding of disability.  Moreover, the record shows that

7    Plaintiff's mother took Plaintiff off his meds on weekends and during the summer.  (AR 46.)

8    Plaintiff's behavioral issues during those times would not support a finding of disability.

9    Accordingly, the record supports the ALJ's conclusion that Plaintiff was not disabled because his

10   impairments could be controlled with medication.

11           In sum, Plaintiff isolates and identifies portions of the record that support a disability

12   finding, but looking at the record as a whole shows that substantial evidence supported the ALJ's

13   decision.  Further, Plaintiff fails to demonstrate any legal error.  The Court finds that the ALJ's

14   decision was supported by substantial evidence and it is not this Court's function to replace the

15   ALJ's determination with the Court's based on the contrary evidence identified by Plaintiff.

16   Accordingly, Plaintiff's appeal is denied.

17                                                    **IV.**

18                                    **CONCLUSION AND ORDER**

19           Based upon the foregoing, the Court finds that the ALJ's analyses were based on the

20   proper legal standards and the ALJ's conclusions are supported by substantial evidence.  The ALJ

21   did not err in determining that Plaintiff suffered from a "less than marked" limitation in the

22   domain of "interacting and relating with others."

23   //

24   //

25   //

26   //

27

28

1    Accordingly, it is HEREBY ORDERED that Plaintiff's appeal from the decision of the

2    Commissioner of Social Security is DENIED.   It is FURTHER ORDERED that judgment be

3    entered in favor of Defendant Commissioner of Social Security and against Plaintiff A.J.I.G.

4    Garcia.

5

6

7    IT IS SO ORDERED.

8

        Dated:    **March 15, 2013**                          _____

9                                                             UNITED STATES MAGISTRATE JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28